**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>RICHARD GRAHAM FOOTE O'DONOGHUE,<br><br>Defendant. | Criminal Action No. 24-566 (CKK) |

**MEMORANDUM OPINION**
(July 22, 2026)

Defendant Graham O'Donoghue moves to dismiss Counts One through Eight of the Indictment for lack of venue. These Counts charge O'Donoghue with tax evasion for the years 2012 through 2015 (Counts One through Four) and subscribing to false tax returns for those same years (Counts Five through Eight). O'Donoghue argues that neither the "high seas" venue statute, 18 U.S.C. § 3238, nor the general venue statute, 18 U.S.C. § 3237(a), establish venue in the District of Columbia because (i) each offense involves essential conduct that occurred in the United States, and (ii) none of the offenses involve any conduct that occurred in the District of Columbia. Upon consideration of the parties' submissions,[1] the relevant legal authority, and the entire record, the Court shall **GRANT** O'Donoghue's [79] Motion to Dismiss Count 1–8 of the Indictment for Lack of Venue.

---

[1] The Court's consideration has focused on the Indictment, Dkt. No. 1 ("Indictment"); O'Donoghue's Motion to Dismiss Count 1-8 of the Indictment for Lack of Venue, Dkt. No. 79 ("Def.'s Mot."); the Government's Opposition to O'Donoghue's Motion to Dismiss, Dkt. No. 89 ("Gov't's Opp'n"); O'Donoghue's Reply to the Government's Opposition, Dkt. No. 95 ("Def.'s Reply"); the Government's Sur-Reply to O'Donoghue's Reply, Dkt. No. 105-1 ("Gov't's Sur-Reply"); and O'Donoghue's Response to the Government's Sur-Reply, Dkt. No. 110 ("Def.'s Response").

## I. BACKGROUND

Defendant Graham O'Donoghue is a United States citizen who began living and working abroad in 2011. Indictment ¶ 1. His last known residence in the United States was in the District of Columbia. *Id*. As a United States citizen living abroad, when O'Donoghue received income above a certain threshold for a given year, he had an obligation to report it to the Internal Revenue Service ("IRS") and pay any resulting income taxes. *Id*. ¶ 3.

O'Donoghue and his family lived in London, United Kingdom, from 2011 to 2013. *Id*. ¶ 4. In 2012 and 2013, O'Donoghue worked as an independent consultant for various foreign companies. *Id*. ¶ 5. O'Donoghue requested and received payment for these services via wire transfer to his personal bank account. *Id*. ¶ 6. No U.S. taxes were withheld or paid over to the IRS from these payments. *Id*.

In mid-2013, O'Donoghue was hired to be the CEO for one of the companies he consulted for, referred to here as Company-1. *Id*. ¶ 7. This led O'Donoghue and his family to relocate to Dubai, United Arab Emirates, where Company-1 was located. *Id*. As CEO of Company-1, O'Donoghue allegedly received regular salary payments that were supplemented by "large lump sum bonus payments." *Id*. ¶ 7. Company-1 allegedly took care of various expenses for O'Donoghue, as well, including O'Donoghue's relocation expenses and several ongoing expenses, such O'Donoghue's rent, car (and driver), and travel insurance. *Id*. It also gave O'Donoghue a corporate credit card, which he is charged with using for personal purchases. *Id*. ¶ 8.

Company-1 terminated O'Donoghue's employment in early 2015. *Id*. ¶ 9. In February 2015, Company-1 allegedly paid O'Donoghue a $684,226 severance payment by wire to his personal bank account. *Id*. ¶ 10. Despite receiving this payment, O'Donoghue allegedly refused to sign a severance agreement. *Id*.

* * *

The Indictment alleges that O'Donoghue "made hundreds of thousands of dollars of income each year from 2012 through 2015." Indictment ¶ 11. While O'Donoghue made periodic estimated payments to the IRS during those years, he failed to timely file his federal individual income tax returns for tax years 2012, 2013, and 2014. *Id.*

* * *

In June 2016, O'Donoghue engaged a U.S. national residing in Serbia and working as a tax preparer ("Tax Preparer-1"), to prepare his U.S. Individual Income Tax Returns, Forms 1040, for tax years 2012 to 2015. *Id.* ¶ 12. The Indictment alleges that O'Donoghue provided false information to Tax Preparer-1 despite knowing he had a duty to report accurate information. *Id.* Specifically, O'Donoghue is alleged to have: told Tax Preparer-1 about only a portion of his independent consulting income from 2012 and 2013; mislabeled his role at Company-1; concealed the expenses Company-1 allegedly paid on his behalf in Dubai along with a significant portion of his other compensation and bonuses from Company-1; and mischaracterized the nature of the lump sum severance payment he received from Company-1 in 2015. *Id.* ¶ 13. As a result, each of the returns for 2012 through 2015 prepared by Tax Preparer-1 allegedly underreported O'Donoghue's total taxable income and the amount of tax he owed. *Id.*

Following the preparation of his 2012–2015 returns, O'Donoghue allegedly caused Tax Preparer-1 to file the allegedly false returns with the IRS. *Id.* ¶ 14. O'Donoghue's 2012 return was filed on June 15, 2016, while his 2013, 2014, and 2015 returns were filed on October 17, 2016. *Id.* Because O'Donoghue was a U.S. citizen living abroad, his returns were addressed to and filed with the IRS service center in Austin, Texas, which proceeded to process O'Donoghue's 2012–2015 returns. *See* Gov't's Opp'n at 2 n.1. According to the Indictment, because O'Donoghue had previously made estimated payments to the IRS, the allegedly false information reported on his

3

2012–2015 returns made it appear as though he was entitled to refunds from the IRS.  Indictment ¶ 14.  As a result, the IRS deposited a significant portion of the purported refund amounts directly into O'Donoghue's bank account.  *Id*. ¶ 15.  In total, O'Donoghue is charged with concealing approximately $1 million of income by filing his allegedly false 2012–2015 returns.  *Id*.

\* \* \*

In January 2023, the Government informed O'Donoghue's then-counsel that the IRS had referred criminal charges against O'Donoghue for tax evasion relating to tax years 2012 through 2015.  Gov't's Opp'n at 2.  The Government explained that it intended to present an indictment in the Western District of Texas, the district where the IRS processed O'Donoghue's allegedly false returns.  *Id*.; *see also* Def.'s Sealed Ex. 2, Dkt. No. 80-2 at 1 (

).

Def.'s Sealed Ex. 2 at 1.

In February 2023, O'Donoghue voluntarily participated in an interview with prosecutors and law enforcement agents at Department of Justice Offices in Washington, D.C., pursuant to a written proffer agreement.  Indictment ¶ 16.  The proffer agreement provided that O'Donoghue's truthfulness was an express material condition of the agreement, and that if he was not completely truthful and candid during the interview, his statements could be used against him for any purpose.

*Id*.  O'Donoghue was also orally advised at the beginning of the interview that making false statements to law enforcement could subject him to criminal charges.  *Id*.

During the February 2023 interview, O'Donoghue allegedly "admitted that the income reported on his 2012 to 2015 tax returns was incorrect and did not reflect the income he had actually received in those years."  *Id*. ¶ 18.  According to the Indictment, O'Donoghue explained that he "had used his bank statements to calculate his income each year" and that the numbers he gave Tax Preparer-1 were a mistake.  *Id*.

O'Donoghue is also charged with making several false statements during the February 2023 interview.  "When questioned about specific information he provided to Tax Preparer-1 about his income in 2015," O'Donoghue allegedly made the following false statements regarding the $684,226 lump sum payment he received at the end of his employment with Company-1: *first*, O'Donoghue allegedly stated that a portion of the lump sum payment had been intended for his former executive assistant, and that he had paid her $20,000 to $30,000 out of the sum; *second*, O'Donoghue allegedly stated that a portion of the lump sum payment had been an investment by a shareholder of Company-1 into O'Donoghue's business enterprise; and *third*, O'Donoghue allegedly stated that a portion of the lump sum payment had been reimbursement for business expenses he incurred on his personal credit card.  *Id*. ¶ 19.  According to the Indictment, these statements were false because "all of the $684,226 lump sum payment" had been O'Donoghue's severance from Company-1.  *Id*.

In October 2023, the Government reiterated to O'Donoghue's then-counsel that venue for O'Donoghue's prosecution would be in the Western District of Texas and again asked whether O'Donoghue would sign a waiver to permit venue in the District of Columbia.  Gov't's Opp'n at 2–3; *see also* Def.'s Sealed Ex. 1 (███████████████)

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████).  Through his then-counsel,

O'Donoghue informed the Government that he would not waive venue.  Gov't's Opp'n at 2.

* * *

Despite indicating that it would indict O'Donoghue in the Western District of Texas, the Government proceeded with its prosecution in the District of Columbia.  *See* Gov't's Opp'n at 2–3 (where the Government explains that it "reviewed the relevant case law and factual evidence" after communicating with O'Donoghue's then-counsel and decided to proceed in the District of Columbia).  In December 2024, a District of Columbia grand jury handed down an indictment charging O'Donoghue with four counts of tax evasion, in violation of 26 U.S.C. § 7201; four counts of subscribing to false tax returns, in violation of 26 U.S.C. § 7206(1); and one count of making false statements, in violation of 18 U.S.C. § 1001.  *See* Indictment.  O'Donoghue was arrested on these charges in May 2025.  *See* Arrest Warrant, Dkt. No. 6.

O'Donoghue now moves to dismiss the tax evasion counts and the false subscription counts for lack of venue.  The Court shall detail O'Donoghue's argument below, but in a nutshell, he argues that the Court must reject the Government's attempt to use the "high seas" venue statute, 18 U.S.C. § 3238, and the general venue statute, 18 U.S.C. § 3237(a), to establish venue in the District of Columbia because (i) each offense involves essential conduct that occurred in the United States (i.e., the filing of O'Donoghue's allegedly false returns in Austin, Texas), and (ii) none of the offenses involve any conduct that occurred in the District of Columbia.  O'Donoghue's

6

motion is fully briefed and ripe for decision. *See* Gov't's Opp'n; Def.'s Reply; Gov't's Sur-Reply; Def.'s Response to Gov't's Sur-Reply.

## II. LEGAL STANDARD

In a criminal prosecution, the Government "bears the burden of establishing by a preponderance of the evidence that venue is proper with respect to each count charged against the defendant." *United States v. Morgan*, 393 F.3d 192, 195 (D.C. Cir. 2004). "Proper venue in criminal trials is more than just a procedural requirement; it is a constitutionally guaranteed safeguard." *United States v. Root*, 585 F.3d 145, 155 (3d Cir. 2009); *Travis v. United States*, 364 U.S. 631, 634 (1961) (". . . questions of venue are more than matters of mere procedure.").

"Proper venue in criminal proceedings was a matter of concern to the Nation's founders," and this concern has been channeled into our Constitution, which "twice safeguards the defendant's venue right" by tying venue in criminal trials to the place of the alleged criminal conduct. *United States v. Cabrales*, 524 U.S. 1, 6 (1998). Under Article III, the trial "of all Crimes . . . shall be held in the State where the said Crimes shall have been committed;" only when a crime is "not committed within any State" may Congress direct venue elsewhere. U.S. Const. art. III, § 2, cl. 3. The Sixth Amendment "reinforces that command," *Abouammo v. United States*, 146 S. Ct. 1571, 1576 (2026), by protecting a defendant's right to be tried by a jury "of the State and district wherein the [charged] crime shall have been committed," U.S. Const. amend. VI. In sum, and as the Federal Rules of Criminal Procedure explain, the constitutional baseline for venue in criminal proceedings is that "the government must prosecute an offense in a district where the offense was committed." Fed. R. Crim. P. 18.

"A crime is 'committed,' for venue purposes, where its 'essential conduct elements' are completed." *United States v. Jin*, No. 23-cr-091-2 (CKK), 2025 WL 2409749, at *13 (D.D.C. Aug. 19, 2025) (quoting *United States v. Rodriguez-Moreno*, 526 U.S. 275, 280–81 (1999)).

7

Accordingly, "[t]o implement [the] constitutional rule—meaning, to decide where the crime was committed—courts generally must determine the location of the offense's 'essential conduct elements.'" *Abouammo*, 146 S. Ct. at 1576 (quoting *Rodriguez-Moreno*, 526 U.S. at 280). To determine the "essential conduct elements" of an offense—also referred to as "the conduct constituting the offense"—courts must identify "the things a defendant must do to violate the statute at issue." *Id.*; *see also Jin*, 2025 WL 2409749, at *13 (quoting *Rodriguez-Moreno*, 526 U.S. at 280) (explaining that "courts must consider not only the 'verbs of the statute,' but also any other elements that the Government must prove to obtain a conviction"). An offense's "essential conduct elements" may be committed in one district, multiple districts, or, in the case of an entirely foreign crime, no districts at all. Regardless, "the [venue] inquiry remains one into the place of the crime's conduct elements—the acts that the prosecution must prove to secure a conviction." *Abouammo*, 146 S. Ct. at 1577.

### III. ANALYSIS

O'Donoghue moves to dismiss Counts One through Eight of the Indictment for lack of venue. Counts One through Four charge O'Donoghue with tax evasion for the years 2012 through 2015, while Counts Five through Eight charge O'Donoghue with subscribing to false tax returns for those same years. The Court shall address Counts Five through Eight and then proceed to Counts One through Four. In the end, the Court concludes that the District of Columbia is not a proper venue for the prosecution of Counts One through Eight.

> **A. The District of Columbia is not a proper venue for the prosecution of Counts Five through Eight, which charge O'Donoghue with subscribing to false tax returns for tax years 2012 through 2015.**

Counts Five through Eight of the Indictment charge O'Donoghue with subscribing to false tax returns for the years 2012 through 2015 (hereinafter, the "false-subscription charges"). Indictment ¶¶ 23–24. Specifically, the Indictment charges that in 2016, "in Dubai, United Arab

Emirates and elsewhere," O'Donoghue "willfully made and subscribed and filed, caused to be filed, and attempted to file" with the IRS false individual income tax returns for the years 2012, 2013, 2014, and 2015, each of which was "verified by a written declaration that it was made under the penalties of perjury." Indictment ¶ 24. It is alleged that O'Donoghue did not believe these returns to be true and correct as to the following material facts:

| Count | Tax Year | Approximate Attempted Filing Date | Allegedly False Items |
|-------|----------|-----------------------------------|-----------------------|
| 5 | 2012 | June 15, 2016 | -Line 12, business income<br>-Line 22, total income<br>-Schedule C, Line 1, gross receipts |
| 6 | 2013 | October 17, 2016 | -Line 12, business income<br>-Line 22, total income<br>-Schedule C, Line 1, gross receipts |
| 7 | 2014 | October 17, 2016 | -Line 7, wages<br>-Line 22, total income |
| 8 | 2015 | October 17, 2016 | -Line 7, wages<br>-Line 22, total income |

*Id*.

The Government seeks to establish venue for the false-subscription charges in the District of Columbia under the "high seas" venue statute, which provides, in full, that

> The trial of all offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, shall be in the district in which the offender, or any one of two or more joint offenders, is arrested or is first brought; but if such offender or offenders are not so arrested or brought into any district, an indictment or information may be filed in the district of the last known residence of the offender or of any one of two or more joint offenders, or if no such residence is known the indictment or information may be filed in the District of Columbia.

18 U.S.C. § 3238. According to the Government, venue is proper in the District of Columbia under the "high seas" venue statute because O'Donoghue's allegedly false tax returns were prepared by Tax Preparer-1 and signed by O'Donoghue abroad, and the Government indicted

9

O'Donoghue in the district of his last known residence (the District of Columbia) before he was arrested or first brought into the United States. *See* Gov't's Opp'n at 6–7; Gov't's Sur-Reply at 5–6.

O'Donoghue argues that the Constitution prevents the Government from using the "high seas" venue statute to establish venue for the false-subscription charges in the District of Columbia. O'Donoghue points to Article III, which provides that criminal trials "shall be held in the State where the said Crimes shall have been committed" and limits Congress' power to direct venue elsewhere to cases involving crimes "not committed within any State."  U.S. Const. art. III, § 2, cl. 3.  According to O'Donoghue, because the filing of his allegedly false tax returns is an "essential conduct element" of the false-subscription charges, and because this filing occurred in Austin, Texas, the false-subscription charges were "committed within [a] State" under Article III and therefore fall beyond Congress' power to direct venue under the "high seas" venue statute. *See* Def.'s Mot. at 3–5; Def.'s Reply at 1–4.  Accordingly, because the "high seas" venue statute is the Government's only basis for laying the false-subscription charges in the District of Columbia, O'Donoghue argues that the charges should be dismissed for lack of venue.

At bottom, O'Donoghue's motion to dismiss the false-subscription charges for lack of venue presents two interrelated issues.  First, the Court must determine whether the act of filing is an essential conduct element of the false-subscription charges, and if so, whether that conduct occurred in the Western District of Texas.  Second, if the Court finds that the act of filing is an essential conduct element that occurred in the Western District of Texas, the Court must determine whether such domestic conduct prevents the Government from using the "high seas" venue statute to establish venue in a district where no relevant conduct occurred.

1.    <u>The act of filing is an essential conduct element of the false-subscription charges, and the filing of O'Donoghue's allegedly false returns occurred in the Western District of Texas.</u>

Proper venue is determined according to the *locus delicti* of a given offense. *See United States v. El-Saadi*, 549 F. Supp. 3d 148, 156 (D.D.C. 2021) (RDM) (citing *United States v. Morgan*, 393 F.3d 192, 196 (D.C. Cir. 2004)) (defining the term *locus delicti* as "the scene of the crime"); *see also Locus Delicti*, BLACK'S LAW DICTIONARY (12th ed. 2024) (translating the term to mean the "place of the wrong" and defining it as "[t]he place where an offense was committed; the place where the last event necessary to make the actor liable occurred"). The *locus delicti* of an offense, in turn, "must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *Cabrales*, 524 U.S. at 6–7 (quoting *United States v. Anderson*, 328 U.S. 699, 702 (1946)). Accordingly, to determine where the false-subscription charges were "committed" for purposes of venue, the Court "must initially identify the conduct constituting the offense"—also known as the "essential conduct elements" of the offense—and then "discern the location of the commission of the criminal acts." *Rodriguez-Moreno*, 526 U.S. at 279; *Abouammo*, 146 S. Ct. at 1576–77.

The Government brings the false-subscription charges against O'Donoghue under 26 U.S.C. § 7206(1), which provides that

> Any person who . . . Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter . . . shall be guilty of a felony[.]

26 U.S.C. § 7206(1).

The parties agree that the essential conduct elements of the false-subscription charges include the preparation and the signing of O'Donoghue's allegedly false returns, both of which occurred abroad. *See* Def.'s Mot. at 4; Gov't's Opp'n at 6; Gov't's Sur-Reply at 5–6. Initially,

the parties also agreed that the essential conduct elements included the filing of O'Donoghue's allegedly false returns. *See* Gov't's Opp'n at 4 (arguing that venue would be "proper in any district in which the false return was prepared and signed, as well as the district in which it was received and filed," because "these are the essential conduct elements of the offense"); Def.'s Mot. at 4–5 (arguing the same). But the Government has since backtracked from this position. Although the Government maintains that venue may be proper in "the district where a return was received by the IRS," it argues in its Sur-Reply that "the 'essential conduct element' for this offense is the *making and subscribing of the false return*, not the IRS' act of receiving it." Gov't's Sur-Reply at 5–6 (emphasis in original); *see also* Def.'s Response to Gov't's Sur-Reply at 3 (arguing that the Government "***conceded*** (correctly) in its opposition" that filing was an essential conduct element, despite "[arguing] the opposite in its sur-reply" "[w]ithout acknowledging this concession") (emphasis in original).

The issue, therefore, is whether the filing of O'Donoghue's allegedly false returns is an essential conduct element of the false-subscription charges. Upon consideration of this issue, the Court determines that the filing of O'Donoghue's allegedly false returns—in addition to their preparation and signing—is an essential conduct element of the false-subscription charges, and that this filing occurred in the Western District of Texas.

> a. *The filing of O'Donoghue's allegedly false returns for 2012–2015 is an essential conduct element of the false-subscription charges because it is something the Government must prove to obtain a conviction under 26 U.S.C. § 7206(1).*

To determine whether the filing of O'Donoghue's allegedly false returns is an essential conduct element of the false-subscription charges, the Court must determine whether such filing is one of "the things a defendant must do to violate" Section 7206(1) of the Internal Revenue Code.

*Abouammo*, 146 S. Ct. at 1576.  Again, the text of Section 7206(1), titled, "Declaration under penalties of perjury," provides, in relevant part, that

> Any person who . . . Willfully makes and subscribes [a] return . . . which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter . . . shall be guilty of a felony[.]

26 U.S.C. § 7206(1).  According to the Indictment, O'Donoghue violated Section 7206(1) when he "willfully made and subscribed and filed, caused to be filed, and attempted to file" income tax returns for 2012–2015 that were "verified by" the requisite written declarations and which O'Donoghue "did not believe to be true and correct as to every material fact."  Indictment ¶ 24.

Numerous courts have found that "[t]o obtain a conviction [under Section 7206(1)], the Government must prove that the defendant filed a tax return." *Neder v. United States*, 527 U.S. 1, 16 (1999).[2]  The Government has not identified any caselaw to the contrary.  Furthermore, it is hard to see how the Government could prove the false-subscription charges against O'Donoghue without proving that O'Donoghue's allegedly false returns were filed with the IRS.  Indeed, the Government describes the false-subscription charges as "four counts of *filing* false tax returns, in violation of 26 U.S.C. § 7206(1)," and it has explicitly argued that filing is an essential conduct element of the offense.  Gov't's Opp'n at 3–4 (emphasis added).

---

[2] *See United States v. Boitano*, 796 F.3d 1160, 1163 (9th Cir. 2015) ("Our court has long held that 'filing' is an element of a § 7206(1) violation."); *United States v. Tarwater*, 308 F.3d 494, 504 (6th Cir. 2002) ("Section 7206 is a perjury statute that criminalizes lying on any document filed with the IRS."); *United States v. Gricco*, 277 F.3d 339, 350 (3d Cir. 2002) (". . . the offense of making a false return requires proof of a false statement on a return, whereas a violation of 26 U.S.C. § 7201 may be shown even if the taxpayer did not file a return at all."); *United States v. Pace*, 314 F.3d 344, 352 (9th Cir. 2002) ("A communication must be sent before it is received. Thus, the crime of 'making' a false tax return commences when one furnishes information essential to the return, and is not completed until the information is received by the party to whom it is addressed."); *United States v. Gilkey*, 362 F. Supp. 1069, 1071 (E.D. Pa. 1973) (". . . we think that a filled-in form 1040 does not become a 'return,' and a taxpayer does not 'make a return,' until it is filed with the Internal Revenue Service. To hold otherwise would be not only to defy precedent, but also to offend common sense notions of fairness."); *see also United States v. Lawhon*, 499 F.2d 352, 355 (5th Cir. 1974); *U.S. v. Vallone*, 698 F.3d 416, 507 (7th Cir. 2012), *cert. granted, judgment vacated on other grounds*, 133 S. Ct. 2825 (2013) ("The preparation of a false tax return can be a multi-district offense, as the return may be prepared in one district, subscribed to in another district, and filed in a third district; venue would thus be appropriate in any of these districts.").

The text of Section 7206(1), however, disturbs the apparent clarity gleaned from the caselaw and the charges.  For Section 7206(1) mentions only the "mak[ing] and subscrib[ing]" of a return and not the filing of a return.  26 U.S.C. § 7206(1).  The Government appears to latch on to this language in arguing that "the 'essential conduct element' for this offense is the *making and subscribing of the false return*, not the IRS' act of receiving it."  Gov't's Sur-Reply at 6.  The question, therefore, is whether the text of Section 7206(1) warrants a departure from the weight of authority and the nature of the specific charges brought here.

The Court determines that the text of Section 7206(1) does not warrant such a departure. While Section 7206(1) does not expressly establish a filing requirement, the Court concludes that, "whether filing is viewed as a separate implicit, but necessary, element of a Section 7206(1) offense or as incorporated in the statutory 'making' requirement, there can be no Section 7206(1) offense without filing."  *United States v. Swanson*, 1997 WL 225446, at *1–2 (4th Cir. May 5, 1997) (per curiam) (collecting cases) (citation modified).  Multiple aspects of the text support this conclusion.

To start, Section 7206(1)'s reference to anyone who "makes . . . [a] return" is best read to refer to someone who files a return.  While the Code does not provide an explicit definition of the term "return" as it is used in Section 7206(1), the Code's definition of the term elsewhere suggests that it is a term of art used to refer to a document that is filed.  The Code's primary privacy provision, for instance, defines the term as a document that "is filed with the Secretary."  26 U.S.C. § 6103(b)(1).  Moreover, information does not become protected "return information" under this privacy provision until it is "received by, recorded by, prepared by, furnished to, or collected by the Secretary."  *Lomont v. O'Neill*, 285 F.3d 9, 15 (D.C. Cir. 2002) (quoting 26 U.S.C. § 6103(b)(2)).  Another example is the Code's statute of limitations for the IRS to assess tax liability,

14

which defines "return" as a document "required to be filed by the taxpayer," 26 U.S.C. § 6501(a), and has been interpreted to mean that "a return does not trigger the running of the statute of limitations unless it is filed in the place required by the statute or regulations," *Comm'r of IRS v. Est. of Sanders*, 834 F.3d 1269, 1274 (11th Cir. 2016) (citing *Allnutt v. Comm'r*, 523 F.3d 406, 413 (4th Cir. 2008)).  Furthermore, the Supreme Court's longstanding test to determine whether a document is a "return" incorporates the act of filing; a document is a return "if it purports to be a return, is sworn to as such, and evinces an honest and genuine endeavor to satisfy the law," even if "at the time of filing the omissions or inaccuracies are such as to make amendment necessary." *Zellerbach Paper Co. v. Helvering*, 293 U.S. 172, 180 (1934).

While the Code does not expressly define how someone "makes" a return under Section 7206(1), reading the term in the context of the Code leads the Court to conclude that 'making' a return requires something more than 'preparing' a return, and that something more is the filing of the return.  For one thing, another provision in Section 7206—Section 7206(2)—already criminalizes the act of preparation; it penalizes anyone who willfully "aids or assists in, or procures, counsels, or advises the preparation or presentation . . . of a return." 26 U.S.C. § 7206(2). For another, when the Code refers to the 'making' of a return elsewhere, it does so in clear reference to the act of filing.  Most notable in this regard is the Code's penalization for the "[w]illful failure to file a return," which makes it a misdemeanor for "[a]ny person required . . . to make a return" to "willfully fail[] to . . . make such return . . . at the time or times required by law or regulations."  26 U.S.C. § 7203 (titled, "Willful failure to file return, supply information, or pay tax").  The Court is not aware of any law or regulation that dictates the "time or times" by which taxpayers must *prepare* their returns, only the "time or times" by which taxpayers must *file* their

returns.  With this statutory context, the Court concludes that someone "makes" a return under Section 7206(1) by filing that return.

The remaining language in Section 7206(1) further clarifies that filing is an essential conduct element of the false-subscription charges against O'Donoghue.  Not only must the Government prove that O'Donoghue "[made] . . . [a] return," but it must also show that such return was "verified by" a written declaration that the return was "made under the penalties of perjury," and that O'Donoghue "[did] not believe [the return] to be true and correct as to every material matter."  26 U.S.C. § 7206(1).  By requiring the Government to prove that a return was "verified by" a written declaration that the return was "made under the penalties of perjury," the statute plainly contemplates that a return is something that is packaged and sent to another for use in an official process or proceeding (i.e., filed).  Furthermore, by requiring the Government to prove that O'Donoghue "[did] not believe [the return] to be true and correct as to every material matter," the statute imposes a materiality requirement that necessarily implies a recipient.  As the Supreme Court has explained, for a false statement to be "material" under Section 7206(1), it must have "a natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was addressed."  *Neder*, 527 U.S. at 16 (internal citations omitted).  Accordingly, it is hard to see how the Government could prove that a matter is "material" under the statute without first proving that the matter was, in some form or another, "addressed" to a "decisionmaking body" (i.e., filed).  *Id*.

In addition to the text of the statute, a broader interpretative principle supports reading Section 7206(1) to require a finding that O'Donoghue filed the allegedly false returns at issue.  The Court referenced above that the Code makes it a misdemeanor to willfully fail to file a return that is due under law.  *See* 26 U.S.C. § 7203 (titled, "Willful failure to file return, supply information,

16

or pay tax").  In *Spies v. United States*, 317 U.S. 492 (1943), the Supreme Court characterized this misdemeanor as a crime of omission and distinguished it from the felony of tax evasion, explaining that, while "[w]illful but passive neglect of the statutory duty may constitute the lesser offense" of misdemeanor failure to file, such passive neglect must be "combine[d] with" a "willful and positive attempt" to evade tax in order to "lift[] the offense to the degree of felony."  *Spies*, 317 U.S. at 499.  While the present matter concerns felony false-subscription charges rather than felony tax evasion charges,[3] the Court reads *Spies* to caution that, for tax felonies, "the gravest of offenses against the revenues," "Congress intended some willful commission in addition to the willful omissions that make up the list of misdemeanors."  *Id*.  Reading Section 7206(1) to require the Government to prove that an allegedly false return was filed is not only the best reading of the text, but also it is in harmony with the principle articulated in *Spies*.

The Court's reading of Section 7206(1) aligns with the other courts that have weighed in on this issue.  Some of these courts have explicitly held that filing is an element of a Section 7206(1) violation.[4]  Others have simply held that venue for a Section 7206(1) offense is proper in the district where an allegedly false return was filed.[5]  Considering the text of the statute, the weight of this authority, and the fact that the false-subscription charges against O'Donoghue arose out of his alleged filing of allegedly false returns with the IRS, the Court concludes that the Government must prove that O'Donoghue's allegedly false returns were filed with the IRS in order to convict O'Donoghue of the false-subscription charges.    Accordingly,   the   filing   of

---

[3] The Court deals with the tax evasion charges against O'Donoghue in Section III.B.

[4] *See, e.g.*, *Boitano*, 796 F.3d 1160, 1163; *Tarwater*, 308 F.3d 494, 504; *Gricco*, 277 F.3d 339, 350; *Pace*, 314 F.3d 344, 352; *Gilkey*, 362 F. Supp. 1069, 1071.

[5] *See, e.g., United States v. Rooney*, 866 F.2d 28, 31 (2d Cir. 1989); *United States v. Shyres*, 898 F.2d 647, 657 (8th Cir. 1990); *United States v. Marrinson*, 832 F.2d 1465, 1475 (7th Cir. 1987); *Vallone*, 698 F.3d at 507; *Lawhon*, 499 F.2d at 355.

O'Donoghue's allegedly false returns is an essential conduct element of the false-subscription charges.

b.   *Because O'Donoghue's allegedly false income tax returns for 2012–2015 were filed and processed at the IRS service center in Austin, Texas, the false-subscription charges involve conduct that was "committed," for purposes of venue, in the Western District of Texas.*

As determined above, the essential conduct elements of the false-subscription charges include the preparation, signing, and filing of O'Donoghue's allegedly false income tax returns for 2012–2015.  *See supra* Section III.A.1.a.  Having identified those essential conduct elements, the Court must now "discern the location of the commission of [those] criminal acts."  *Rodriguez-Moreno*, 526 U.S. 275, 279.  In other words, the Court must determine where the false-subscription charges were "committed" for purposes of venue.  *Id.*

The Court shall focus on the location of filing, as the parties do not dispute that O'Donoghue's allegedly false returns were allegedly prepared and signed abroad.  *See* Def.'s Mot. at 4–5; Gov't's Opp'n at 6.  O'Donoghue's 2012–2015 income tax returns were filed through a process that was initiated abroad and completed in the Western District of Texas.  O'Donoghue's 2012 return was mailed by O'Donoghue from the UAE to the IRS service center in Austin, Texas, while his 2013–2015 returns were sent electronically by Tax Preparer-1 from Serbia to the IRS service center in Austin, Texas.[6]  Gov't's Opp'n at 2.  O'Donoghue's 2012–2015 income tax returns were sent to the IRS service center in Austin, Texas, because, as the Government explains, that "is where all U.S. taxpayers living abroad must file their federal returns," unless they are enclosing a check or money order, "in which case they are supposed to send their tax returns to an IRS office in Charlotte, North Carolina instead."  *Id.* at 2 n. 1.

---

[6] The Government confirms that the "[p]rocessing codes on Defendant's 2013 to 2015 tax returns indicate that the returns were in fact processed through the Austin, Texas service center."  Gov't's Opp'n at 2 n. 1.

It is undisputed that the false-subscription charges constitute allegations of a "continuing offense." *See* Def.'s Mot. at 4; Gov't's Opp'n at 4 (explaining that "[f]iling a false return" is a "continuing offense," meaning "venue is proper in any district in which the false return was prepared and signed, as well as the district in which it was received and filed"). A "continuing offense" is defined by statute as "[a]ny offense involving the use of the mails, transportation in interstate or foreign commerce, or the importation of an object or person into the United States," and such offense may be prosecuted "in any district from, through, or into which such commerce, mail matter, or imported object or person moves." 18 U.S.C. § 3237(a). "By utilizing the doctrine of a continuing offense, Congress may . . . provide that the locality of a crime shall extend over the whole area through which force propelled by an offender operates." *United States v. Johnson*, 323 U.S. 273, 275 (1944). This same statute creates a special rule for venue in false-subscription cases brought under Section 7206(1): where venue for a Section 7206(1) offense "is based solely on a mailing to the Internal Revenue Service, and prosecution is begun in a judicial district other than the judicial district in which the defendant resides," the defendant may "elect to be tried in the district in which he was residing at the time the alleged offense was committed." *Id*. § 3237(b).

Because O'Donoghue's allegedly false income tax returns for 2012 through 2015 were received and processed by the IRS service center in Austin, Texas, the false-subscription charges were "committed," at least in part, in the Western District of Texas. "Both the Supreme Court and [the D.C. Circuit] have held that the place where a document is to be filed may be regarded as the place where any asserted non-filing or misfiling occurred." *Sec. & Exch. Comm'n v. Savoy Indus., Inc.*, 587 F.2d 1149, 1155 (D.C. Cir. 1978) (citing *Travis*, 364 U.S. at 636) (other citations omitted). That O'Donoghue was never physically located in Austin, Texas, does not impact this conclusion. The Supreme Court has "long recognized" that "there may be a constructive presence

19

in a state, distinct from a personal presence, by which a crime may be consummated," particularly for continuing offenses like the false-subscription charges. *United States v. Han*, 280 F. Supp. 3d 144, 150 (D.D.C. 2017) (JEB) (quoting *Hyde v. United States*, 225 U.S. 347, 362 (1912), *superseded on other grounds by Peña–Rodriguez v. Colorado*, 580 U.S. 206 (2017)). "The constitutional requirement is as to the locality of the offense, and not the personal presence of the offender." *Travis*, 364 U.S. at 634 (citation omitted). "The focus for venue purposes, therefore, is on the *conduct* not the *actor*." *Han*, 280 F. Supp. 3d at 150 (emphasis in original). Here, O'Donoghue is alleged to have consummated his false-subscription offense by filing allegedly false returns with the IRS at its service center in Austin, Texas, "thereby propelling a force into" the Western District of Texas. *United States v. Rooney*, 866 F.2d 28, 31 (2d Cir. 1989); *Johnson*, 323 U.S. at 275.

Accordingly, the Court concludes that, because the filing of O'Donoghue's allegedly false returns was completed in the Western District of Texas, the false-subscription charges were "committed" in the Western District of Texas for purposes of venue.

      2.      <u>Because the false-subscription charges were "committed" in the Western District of Texas, the District of Columbia is not a proper venue for those charges.</u>

Now that the Court has identified the essential conduct elements of the false-subscription charges and located the places of their alleged commission, it may determine whether the District of Columbia is a proper venue for those charges. No relevant conduct is alleged to have occurred in the District of Columbia. Accordingly, to establish venue in the District of Columbia for the false-subscription charges, the Government relies exclusively on the "high seas" venue statute, which directs the proper venue for "[t]he trial of all offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district." 18 U.S.C. § 3238.

The "high seas" venue statute must be read against the constitutional foundation for venue in criminal trials, which is that the trial "of all Crimes . . . shall be held in the State where the said Crimes shall have been committed." U.S. Const. art. III, § 2, cl. 3; *see also* U.S. Const. amend. VI (establishing the right to be tried by a jury "of the State and district wherein the [charged] crime shall have been committed"). Congress' residual power to direct venue through statutes like the "high seas" venue statute is limited to the trial of crimes that are "not committed within any State." U.S. Const. art. III, § 2, cl. 3. Accordingly, to determine whether the "high seas" venue statute establishes venue for a given offense, the Court must define the scope of the "high seas" venue statute in relation to the constitutional foundation for venue.

The Court did just that in *United States v. Jin*, No. 23-cr-091-2 (CKK), 2025 WL 2409749 (D.D.C. Aug. 19, 2025). Regarding the constitutional requirements for venue, the Court determined that, because an offense is "committed" wherever its "essential conduct elements" are completed, an offense falls within Congress' residual power to direct venue for crimes "not committed within any State" only if all the "essential conduct elements" of the offense were completed outside the United States. *Jin*, 2025 WL 2409749, at *18 (citing *Rodriguez-Moreno*, 526 U.S. at 279–80). Therefore, "[t]o avoid an unconstitutional application" of the "high seas" venue statute, this Court interpreted the statute to apply "only to offenses that are sufficiently 'begun or committed' outside the United States that the 'essential conduct elements' of the offense are completed abroad." *Id*. at *21 (citing *Rodriguez-Moreno*, 526 U.S. at 279–80; 18 U.S.C. § 3238). In other words, "[i]f some of the essential conduct elements of an offense are completed in the United States, then the offense lies outside of Congress's constitutional authority to specify a venue other than the place where a charged crime was committed." *Id*.

21

The Court finds that the reasoning of *Jin* applies with full force here. Because an essential conduct element of the false-subscription charges—filing—was completed domestically in the Western District of Texas, the false-subscription charges fall beyond Congress' authority to direct venue for offenses "not committed within any State." U.S. Const. art. III, § 2, cl. 3. The "high seas" venue statute, therefore, cannot be used to establish venue in the District of Columbia for the false-subscription charges. Accordingly, because the "high seas" venue statute is the only means by which the Government may attempt to establish venue for the false-subscription charges in the District of Columbia, it follows that the District of Columbia is not a proper venue for the false-subscription charges.

* * *

In sum, the Court concludes that the District of Columbia is not a proper venue for the false-subscription charges. The "high seas" venue statute does not establish venue in the District of Columbia because the essential conduct element of filing occurred domestically in the Western District of Texas. And there are no alternative means to establish venue in the District of Columbia because there are no allegations of any relevant conduct occurring there. Accordingly, the Court shall **GRANT** O'Donoghue's [79] Motion to Dismiss for Lack of Venue with respect to the false-subscription charges in Counts Five through Eight of the Indictment.

**B. The District of Columbia is not a proper venue for the prosecution of Counts One through Four, which charge O'Donoghue with tax evasion for tax years 2012 through 2015.**

O'Donoghue also moves to dismiss Counts One through Four of the Indictment for lack of venue. These counts charge O'Donoghue with tax evasion for the years 2012 through 2015. Indictment ¶¶ 21–22. Specifically, the Indictment alleges that, from at least in or about January 1, 2012, through in or about February 10, 2023, "in the District of Columbia and elsewhere,"

O'Donoghue willfully and knowingly attempted to evade and defeat a substantial part of his income tax by "committing the following affirmative acts of evasion, among others:"

a)  Using corporate funds for personal expenses;

b)  Providing and causing to be provided false information to his tax return preparer for use in the preparation of U.S. Individual Income Tax Returns, Forms 1040, for each of the calendar years 2012, 2013, 2014 and 2015, and; [sic]

c)  Preparing and causing to be prepared, and signing and causing to be signed, attempting to file, and causing to be filed with the IRS a false and fraudulent U.S. Individual Income Tax Return, Form 1040, on each of the dates listed below, each filing constituting an act of evasion for the related year:

| Tax Year | Approximate Attempted Filing Date |
| --- | --- |
| 2012 | June 15, 2016 |
| 2013 | October 17, 2016 |
| 2014 | October 17, 2016 |
| 2015 | October 17, 2016 |

d)  Making false statements at a February 2023 interview with law enforcement agents and prosecutors from the Department of Justice about information related to the computation of his tax liability in tax years 2012, 2013, 2014, and 2015.

Indictment ¶ 22(a)–(d).

The Government argues that venue for the tax evasion charges is proper in the District of Columbia "on two alternative grounds." Gov't's Opp'n at 4.

First, the Government argues that venue is proper under the "high seas" venue statute, 18 U.S.C. § 3238, because O'Donoghue allegedly "began and committed affirmative acts of evasion outside the United States—that is, he was in the United Arab Emirates when he provided false information to his tax preparer in Serbia." Gov't's Opp'n at 4 (arguing that "[w]here an offense started overseas and was subsequently partially committed in the United States the offense comes under the purview of Section 3238"); Gov't's Sur-Reply at 4 (arguing that venue is proper because, "[o]ther than Defendant's false statements, all of the charged acts of evasion were completed

23

outside the United States"). The Court rejected this argument with respect to the false-subscription charges, *supra* Section III.A, and it does so again here for the same reasons.[7]  To reiterate: "[i]f some of the essential conduct elements of an offense are completed in the United States, then the offense lies outside of Congress's constitutional authority to specify a venue other than the place where a charged crime was committed."  *Jin*, 2025 WL 2409749, at *21.  The filing of O'Donoghue's allegedly false returns is an essential conduct element for the tax evasion charges, and that filing occurred in the Western District of Texas.[8]  Accordingly, the "high seas" venue statute cannot establish venue in the District of Columbia.

As an alternative, the Government argues that venue for the tax evasion charges is proper in the District of Columbia under the general venue statute, which provides, in relevant part, that

> Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.

18 U.S.C. § 3237(a).  According to the Government, venue is proper under the general venue statute because O'Donoghue "committed affirmative acts of evasion in D.C. when he made false statements about his taxable income to law enforcement agents" during the February 2023 interview identified above.  Gov't's Opp'n at 5.  O'Donoghue objects to the Government's framing of his alleged February 2023 statements, arguing that these statements do not provide a basis for establishing venue under the general venue statute because "the underlying alleged tax evasion was complete when the tax returns were filed in June and October 2016," Def.'s Mot. at 5, and

---

[7] O'Donoghue raises the same objection to the Government's attempt to establish venue under the "high seas" venue statute as he did with respect to the false-subscription charges.  *See* Def.'s Reply at 4–5.

[8] As the Court shall describe in more detail below, the essential conduct elements for the tax evasion charges include any affirmative act allegedly taken by O'Donoghue to evade or defeat the IRS's assessment of his income tax for years 2012 through 2015.  Since O'Donoghue is charged with attempting to evade assessment by filing allegedly false income tax returns that underreported his income, the filing of those returns is an essential conduct element of the offense.

"[a]lleged false statements made to criminal investigators more than six years after the tax returns were filed and the alleged evasion was completed cannot, as a matter of law, constitute acts of a long-since-completed evasion offense," Def.'s Reply at 4–5.

Therefore, to determine whether the District of Columbia is a proper venue for the tax evasion charges, the Court must determine whether O'Donoghue's alleged February 2023 false statements in the District of Columbia constitute an affirmative act of evasion with respect to the IRS's assessment of O'Donoghue's income tax liability for 2012 through 2015. To make this determination, the Court must first identify the nature of O'Donoghue's alleged tax evasion offense and its essential conduct elements, and then discern whether O'Donoghue's alleged February 2023 false statements can reasonably be characterized as part of that charged offense. Accordingly, because the nature of the tax evasion charges against O'Donoghue delineates the scope of the "act or acts constituting" those charges, *Cabrales*, 524 U.S. at 6–7, the Indictment's authority to define the conduct constituting the charged tax evasion, while broad, is not unlimited, *United States v. Pumphrey*, 831 F.2d 307, 309 (D.C. Cir. 1987) (". . . our own and Supreme Court precedent has consistently held that excess allegations in an indictment that do not change the basic nature of the offense charged need not be proven and should be treated as mere surplusage.") (citations omitted).

    1.    <u>O'Donoghue is charged with attempting to evade or defeat the IRS's "assessment" of his income tax liability for tax years 2012 through 2015, and, therefore, the "essential conduct elements" of the charged tax evasion shall include any affirmative act taken by O'Donoghue that would have the likely effect of evading the IRS's assessment for those years.</u>

Again, proper venue is determined according to the *locus delicti* of a given offense. *El-Saadi*, 549 F. Supp. 3d at 156 (citing *Morgan*, 393 F.3d at 196). And the *locus delicti* of an offense "must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *Cabrales*, 524 U.S. at 6–7 (quoting *Anderson*, 328 U.S. at 702). Accordingly, to

determine whether O'Donoghue's alleged February 2023 false statements establish venue for the tax evasion charges in the District of Columbia under the general venue statute, the Court must first determine the "nature" of O'Donoghue's alleged tax offense and identify "the act or acts constituting" that offense. *Id*.; *Rodriguez-Moreno*, 526 U.S. at 279.

Here, Counts One through Four charge O'Donoghue with tax evasion under 26 U.S.C. § 7201, which provides that "Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall . . . be guilty of a felony[.]" 26 U.S.C. § 7201. The "tax" that O'Donoghue is charged with attempting to evade or defeat is his personal income tax for tax years 2012 through 2015. Indictment ¶¶ 21–22.

The nature of a tax evasion offense under Section 7201 can take one of two forms. On its face, Section 7201 prohibits any willful attempt to evade or defeat "any tax" or "the payment thereof." 26 U.S.C. § 7201. The Supreme Court has therefore interpreted Section 7201 to "include[] two offenses: 'the offense of willfully attempting to evade or defeat the *assessment* of a tax as well as the offense of willfully attempting to evade or defeat the *payment* of a tax.'" *Kawashima v. Holder*, 565 U.S. 478, 488 (2012) (quoting *Sansone*, 380 U.S. at 354) (emphasis in original). In other words, while Section 7201 establishes the single offense of tax evasion, "[t]here is a distinction between willfully attempting to evade the *assessment* of the tax and willfully attempting to evade or defeat the *payment* of the tax" under Section 7201. *United States v. Conley*, 826 F.2d 551, 557 (7th Cir. 1987) (emphasis in original) (describing them as "separate offense[s]").[9] For example, these two offenses often "require different elements of proof." *McLaughlin*, 126 F.3d at 136.

---

[9] *See also United States v. McLaughlin*, 126 F.3d 130, 136 (3d Cir. 1997) (describing them as "two distinct offenses"); *United States v. Schoppert*, 362 F.3d 451, 454 (8th Cir. 2004) (explaining that they are "two separate types of offenses"); *United States v. Hogan*, 861 F.2d 312, 315 (1st Cir. 1988) ("Section 7201 defines two distinct crimes . . ."); *Bussell v. Comm'r*, 130 T.C. 222, 240 (2008) ("We note that section 7201 encompasses two closely related but

The offense of willfully attempting to evade or defeat the *assessment* of a tax—which the Court refers to as assessment-evasion—concerns "efforts to shield taxable income to prevent the IRS from determining one's tax liability." *Root*, 585 F.3d at 151.[10] Whatever the specific conduct charged,[11] "[e]vading the assessment of an income tax can be accomplished only through a course of action that includes underreporting of income." *United States v. Schoppert*, 362 F.3d 451, 456 (8th Cir. 2004). On the other hand, the offense of willfully attempting to evade or defeat the *payment* of a tax—payment-evasion—concerns "conduct designed to place assets out of reach to prevent the IRS from settling one's tax liability." *Root*, 585 F.3d at 151. In short, between the "two distinct crimes" of tax evasion, assessment-evasion describes an attempt to frustrate the IRS's ability to ascertain a tax liability, while payment-evasion describes an attempt to frustrate the IRS's ability to collect an already-ascertained tax liability. *Hogan*, 861 F.2d at 315; *Root*, 585 F.3d at 151.

The tax evasion charges against O'Donoghue are assessment-evasion charges. All the "affirmative acts of evasion" charged in the Indictment relate to the central allegation that O'Donoghue underreported his income for tax years 2012 through 2015. O'Donoghue is charged with the affirmative acts of underreporting his income by using corporate funds for personal expenses from 2013 to 2015 and, in 2016, causing the preparation and filing of false income tax returns with the IRS for the tax years 2012 through 2015. Indictment ¶ 22. These charged affirmative acts allegedly "concealed approximately $1 million of [O'Donoghue's] income," which led to an erroneous assessment of O'Donoghue's tax liability that caused the IRS to pay out

---

distinct crimes . . .").

[10] *See also Hogan*, 861 F.2d at 315 (citing *United States v. Dack*, 747 F.2d 1172, 1174 (7th Cir.1984)); *United States v. Mal*, 942 F.2d 682, 687 (9th Cir. 1991) (collecting cases) (citations omitted).

[11] Such efforts could include, for example, "failing to file a return, filing a false return, failing to keep records, concealing income or other means." *Mal*, 942 F.2d 682, 687; *Lawn v. United States*, 355 U.S. 339, 343 (1958).

refunds to O'Donoghue that he was purportedly not entitled to. *Id*. ¶ 15. The charges, in a nutshell, are quintessential assessment-evasion charges because they allege that O'Donoghue attempted to evade or defeat the IRS's "computation of his tax liability in tax years 2012, 2013, 2014, and 2015." *Id*. ¶ 22(d).

To prove assessment-evasion charges,[12] the Government must show (i) the existence of a tax deficiency; (ii) an affirmative act by the defendant constituting an evasion or attempted evasion of the assessment of a tax; and (iii) willfulness on the part of the defendant while completing the requisite affirmative act. *See Sansone*, 380 U.S. 343, 351; *United States v. Shorter*, 608 F. Supp. 871, 874 (D.D.C. 1985), *aff'd*, 809 F.2d 54 (D.C. Cir. 1987). "Congress did not define or limit the methods by which a willful attempt to defeat and evade [taxes] might be accomplished," and therefore the essential conduct for tax evasion includes any affirmative act with a "tax-evasion motive." *Han*, 280 F. Supp. 3d at 150 (quoting *Spies*, 317 U.S. at 499). Accordingly, considering the nature of the assessment-evasion charges against O'Donoghue, the Court concludes that the essential conduct for these charges shall consist of "any affirmative act" that O'Donoghue is charged to have completed with a motive to evade the IRS's assessment of his income tax for 2012–2015. *Id*.; *Rodriguez-Moreno*, 526 U. S. at 278–80.

> 2.     O'Donoghue's alleged February 2023 false statements are not affirmative acts of the charged assessment-evasion because they did not have the likely effect of evading or defeating the IRS's assessment of his income tax liability for tax years 2012 through 2015.

As referenced above, the nature of the assessment-evasion charges against O'Donoghue delineates the scope of the "act or acts constituting" those charges. *Cabrales*, 524 U.S. at 6–7.

---

[12] Although assessment-evasion and payment-evasion often "require different elements of proof," *McLaughlin*, 126 F.3d at 136, the essential elements for both offenses are structurally the same.

The Indictment alleges that O'Donoghue committed the charged assessment-evasion by "committing the following affirmative acts of evasion, among others:"

a) Using corporate funds for personal expenses;

b) Providing and causing to be provided false information to his tax return preparer for use in the preparation of U.S. Individual Income Tax Returns, Forms 1040, for each of the calendar years 2012, 2013, 2014 and 2015, and; [sic]

c) Preparing and causing to be prepared, and signing and causing to be signed, attempting to file, and causing to be filed with the IRS a false and fraudulent U.S. Individual Income Tax Return, Form 1040, on each of the dates listed below, each filing constituting an act of evasion for the related year:

| Tax Year | Approximate Attempted Filing Date |
|----------|-----------------------------------|
| 2012 | June 15, 2016 |
| 2013 | October 17, 2016 |
| 2014 | October 17, 2016 |
| 2015 | October 17, 2016 |

d) Making false statements at a February 2023 interview with law enforcement agents and prosecutors from the Department of Justice about information related to the computation of his tax liability in tax years 2012, 2013, 2014, and 2015.

Indictment ¶ 22(a)–(d).

Most of the affirmative acts of evasion charged in the Indictment fit naturally within the charged assessment-evasion, which, again, concerns O'Donoghue's alleged attempt to evade or defeat the IRS's assessment of his income tax liability for 2012–2015. The first charged act of evasion—that O'Donoghue used corporate funds for personal expenses—refers to O'Donoghue's alleged use of "his corporate credit card for personal purchases" during his tenure as CEO of Company-1. *See* Indictment ¶ 8. This allegation logically relates to the underlying assessment-evasion charges because, if proven, it could potentially show that O'Donoghue disguised income he received from Company-1 during the relevant years. *See United States v. Khanu*, 675 F. Supp. 2d 55, 61 (D.D.C. 2009) (CKK) (explaining that "affirmative acts of evasion may include . . .

diverting corporate funds for personal use") , *aff'd*, 662 F.3d 1226 (D.C. Cir. 2011).  Furthermore, the second and third charged acts of evasion—that O'Donoghue provided false information to Tax Preparer-1 and caused his allegedly false returns to be filed with the IRS—constitute the core of the charged assessment-evasion.  The Court need not explain why charged acts related to the filing of income tax returns that allegedly "concealed approximately $1 million of income" are directly relevant to the IRS's assessment of tax liability on that income.  Because these charged acts of evasion logically relate to the IRS's ability to assess O'Donoghue's income tax liability for 2012 through 2015, there is no issue with characterizing them as part of the charged assessment-evasion.

O'Donoghue's alleged February 2023 false statements, however, do not have a comparable connection to the underlying assessment-evasion charges.  According to the Indictment, "[w]hen questioned about specific information he provided to Tax Preparer-1 about his income in 2015," O'Donoghue allegedly made the following false statements regarding the $684,226 lump sum payment he received at the end of his employment with Company-1: *first*, that a portion had been intended for his former executive assistant, and that he had paid her $20,000 to $30,000 out of the sum; *second*, that a portion had been an investment by a shareholder of Company-1 into O'Donoghue's business enterprise; and *third*, that a portion had been reimbursement for business expenses he incurred on his personal credit card.  *Id.* ¶ 19.  These are charged as false statements because the entire lump sum payment had allegedly been O'Donoghue's severance from Company-1, *id.*, and the Indictment connects them to the assessment-evasion charges by claiming that they "had the tendency to impact the investigation . . . into [O'Donoghue's] income from Company-1 and tax liability in years 2012, 2013, 2014, and 2015," *id.* ¶ 20.  On the face of the Indictment, however, this connection is tenuous.

30

To start, there is a significant temporal gap between O'Donoghue's alleged February 2023 false statements and the remainder of the alleged acts constituting the charged assessment-evasion. O'Donoghue's alleged use of corporate funds for personal expenses would have occurred at some point between "mid-2013" and "early 2015," as that is when he was employed by Company-1. Indictment ¶¶ 7–9.  And the charged conduct regarding the filing of his allegedly false returns would have occurred between June 2016, when O'Donoghue allegedly "engaged" Tax Preparer-1, and October 2016, when the last of O'Dononghue's allegedly false returns were filed.  *Id*.  ¶¶ 12–14.  At the very least, then, there is more than a six-year gap between O'Donoghue's alleged February 2023 false statements and the remainder of the acts constituting the charged assessment-evasion.  This gap gives reason to question whether O'Donoghue's alleged February 2023 false statements are indeed related to the underlying assessment-evasion charges.

Further straining the connection between O'Donoghue's alleged February 2023 false statements and the underlying assessment-evasion charges is the Indictment's indication that the IRS had completed its assessment of O'Donoghue's 2012–2015 income tax liability before the February 2023 interview took place.  According to the Indictment, the allegedly false information reported in O'Donoghue's income tax returns for tax years 2012 through 2015 made it appear as though O'Donoghue was entitled to refunds on estimated payments that O'Donoghue had previously made to the IRS.  Indictment ¶ 14.  As a result, "[t]he IRS paid out a significant portion of the refund amounts by depositing the funds directly into [O'Donoghue's] bank account."  *Id*. ¶ 15.  These allegations indicate that the IRS finalized its assessment of O'Donoghue's income tax liability prior to the February 2023 interview, which would mean that the object of O'Donoghue's charged assessment-evasion was already complete at the time he allegedly made the February 2023 false statements.  Because the IRS had already completed the assessment O'Donoghue allegedly

31

sought to evade, it is not clear how O'Donoghue's alleged February 2023 false statements could have formed a part of the charged assessment-evasion.

The details of the February 2023 interview also weaken the connection between O'Donoghue's alleged February 2023 false statements and the underlying assessment-evasion charges, as they cast a new light on the Indictment's claim that O'Donoghue's alleged false statements "had the tendency to impact the investigation . . . into [his] income from Company-1 and tax liability in years 2012, 2013, 2014, and 2015." *Id.* ¶ 20. That the February 2023 interview was conducted by "prosecutors and law enforcement agents" at Department of Justice Offices in Washington, D.C., pursuant to a written proffer agreement, *id.* ¶ 16, suggests that the "investigation" allegedly "impact[ed]" by O'Donoghue's alleged false statements was an investigation for purposes of criminal prosecution, not income tax assessment, *id.* ¶ 20. Criminal tax investigations are separate and distinct from civil tax investigations because, as courts have consistently recognized, "[s]ignificantly different rights, responsibilities, and expectations apply to civil audits and criminal tax investigations." *United States v. Grunewald*, 987 F.2d 531, 534 (8th Cir. 1993).[13] Therefore, an IRS criminal investigation is, by definition, an investigation done for purposes other than civil tax assessment.

---

[13] Courts have repeatedly emphasized the distinction between civil investigations/audits (conducted by IRS "revenue agents") and criminal investigations/prosecutions (conducted by IRS-CID, or "special agents"). *See, e.g., id.* ("It is clear that the IRS may not develop a criminal investigation under the auspices of a civil audit. Significantly different rights, responsibilities, and expectations apply to civil audits and criminal tax investigations."); *United States v. Tweel*, 550 F.2d 297, 300 (5th Cir. 1977) (holding that evidence should have been suppressed because it was obtained by the IRS's "shocking conduct" of using a civil revenue agent to "mask[] the undeniable criminal nature of [an] investigation"); *United States v. Peters*, 153 F.3d 445, 454 (7th Cir. 1998) (explaining that "the IRS, in an effort to comply with *Tweel* and its progeny, has constructed a 'Chinese wall' between its civil examination and criminal investigation divisions"); *United States v. Lehman*, 468 F.2d 93, 105 (7th Cir.1972) (stating that "the appellate court cases dealing with fraud in tax situations warn that revenue agents must not affirmatively mislead a taxpayer into believing that the investigation is exclusively civil in nature and will not lead to criminal consequences" (collecting cases)), *cert. denied*, 409 U.S. 967 (1972); *United States v. McKee*, 192 F.3d 535, 541 (6th Cir. 1999) ("IRS regulations explicitly prohibit a revenue agent from developing a criminal case against a taxpayer under the guise of a civil investigation."); *United States v. Adams*, 396 F. Supp. 364, 367 n. 3 (S.D. Ohio 1975) ("Civil investigations are conducted by a different division within the IRS than that which pursues criminal investigations. Civil investigators are known as Revenue Agents while those of the criminal Intelligence Division are referred to as Special Agents.").

Furthermore, any inference that O'Donoghue's alleged false statements formed a part of his alleged assessment-evasion is both weakened by the charge that, during the 2023 interview, O'Donoghue "admitted that the income reported on his 2012 to 2015 tax returns was incorrect," and narrowed by the fact that his alleged false statements related only to "information he provided to Tax Preparer-1 about his income in 2015," specifically about the alleged lump sum payment. *Id.* ¶¶ 16–20. In other words, not only is the inference that O'Donoghue lied at the interview to evade assessment on his 2012–2015 income in tension with O'Donoghue's alleged admission that his 2012–2015 returns underreported his income, but to the extent such an inference can be drawn, it would only extend to O'Donoghue's alleged attempt to evade assessment on his income tax for the year 2015, as that is the only year for which the assessment of his income is implicated by his alleged false statements. *See Morgan*, 393 F.3d 192, 195 (government must show "that venue is proper with respect to each count charged").

Accordingly, upon review of the Indictment, the Court does not see how O'Donoghue's alleged February 2023 false statements could have furthered the charged assessment-evasion. The question now is whether this prevents the Court from characterizing O'Donoghue's alleged false statements as "conduct constituting" the charged assessment-evasion for purposes of venue. *Rodriguez-Moreno*, 526 U.S. at 279 (to determine venue, "a court must initially identify the conduct constituting the offense (the nature of the crime)"). Upon considering this question, the Court concludes that, due to the lack of connection between O'Donoghue's alleged February 2023 false statements and the charged assessment-evasion, it cannot treat the alleged false statements as conduct constituting the charged assessment-evasion for purposes of venue.

The Court reaches this conclusion based on the specific nature of the charged assessment-evasion rather than the broader principle that O'Donoghue advocates. O'Donoghue urges the

33

Court to categorically separate his alleged February 2023 false statements from the assessment-evasion charges on the basis that the assessment-evasion "was complete when [his] tax returns were filed." Def.'s Mot. at 5. As O'Donoghue points out, many courts have held that, "when tax evasion involves the filing of a fraudulent tax return, the offense is complete upon filing." *United States v. Uscinski*, 369 F.3d 1243, 1247 (11th Cir. 2004) (citing *Sansone*, 380 U.S. 343).[14] Most notably, in *Sansone v. United States*, the Supreme Court, noting the distinction between assessment-evasion cases and payment-evasion cases, explained that where an indictment charges "an attempt to evade income taxes by defeating the assessment" for a given year, the charged assessment-evasion is "complete as soon as the false and fraudulent understatement of taxes [is] filed." 380 U.S. 343, 354 (holding that defendant could not defend against assessment-evasion charge for a given year by arguing that they intended to pay the tax at a later date because the offense was complete upon filing) (inline parenthetical removed) (citing *Beacon Brass Co.*, 344 U.S. at 46; *Spies*, 317 U.S. at 498–499). Shortly after *Sansone*, the Supreme Court held, in *United States v. Habig*, 390 U.S. 222 (1968), that the charge of attempting to evade taxes by filing of a false return under Section 7201 is "committed at the time the return is filed." 390 U.S. at 223. There is therefore some support for the general rule advanced by O'Donoghue.

---

[14] *See also id.* ("Because [defendant's] tax evasion was complete upon the filing of his tax return, his false statements to the government were not a continuation of his crime."); *Sansone*, 380 U.S. at 354 (explaining that tax evasion under Section 7201 "was complete as soon as the false and fraudulent understatement of taxes . . . was filed"); *United States v. Habig*, 390 U.S. 222, 223 (1968) (finding that tax evasion charges under Section 7201 involving the evasion of taxes by filing a false return and the preparation and presentation of a false return "are committed at the time the return is filed"); *United States v. Marchant*, 774 F.2d 888, 891 (8th Cir. 1985) (citing *Habig*, 390 U.S. at 223) ("The crime of wilfully [sic] attempting to evade or defeat tax liability is completed when the taxpayer files the tax return with the Internal Revenue Service."); *Grunewald v. United States*, 353 U.S. 391, 406 n.19 (1957) (reasoning that tax evasion charges were governed by a six-year statute of limitations that "began to run when the last return . . . was filed by the taxpayers"); *Han*, 280 F. Supp. 3d at 149 (quoting *Spies*, 317 U.S. at 499) (explaining that tax evasion under Section 7201 "is not completed until the person's tax return is filed, signed, and mailed, but it begins whenever the defendant makes a 'willful attempt to defeat and evade' tax liability").

However, O'Donoghue's proposed general rule—that tax evasion charges based on the filing of false or fraudulent returns are necessarily complete at the time of filing—is also in tension with Section 7201's broad prohibition against any attempt to evade or defeat any tax or the payment thereof "in any manner," 26 U.S.C § 7201, which has been interpreted to apply to "any conduct, the likely effect of which would be to mislead or to conceal," that is accompanied by a "tax-evasion motive," *Spies*, 317 U.S. at 499.  In light of this expansive prohibition, a number of circuit courts have explained that the statute of limitations for tax evasion begins to run upon the "last evasive act," and that "evasive acts following the filing of a return may be considered part of the offense."[15]  *United States v. Anderson*, 319 F.3d 1218, 1220 (10th Cir. 2003).  The Court, however, is not aware of any caselaw applying the "last evasive act" analysis to the question at issue here—i.e., whether, for purposes of venue, post-filing conduct can be considered part of a charged assessment-evasion offense that is based on an allegedly false filing—and there appears to be some disagreement as to whether the analysis applies only to payment-evasion cases or extends to assessment-evasion cases based on the filing of allegedly false returns.  *Compare Uscinski*, 369 F.3d at 1247 n.* (holding that the analysis does not apply to assessment-evasion cases based on false filing because "[w]here a tax return has been filed, *Sansone* applies; and the tax evasion is complete upon filing"), *with Orrock*, 23 F.4th at 1209 (holding that "the last affirmative act of evasion rule applies to both cases" of payment-evasion and assessment-evasion).

---

[15] *See*, *e.g.*, *United States v. Wilson*, 118 F.3d 228, 236 (4th Cir. 1997) ("The limitations period for a violation of § 7201 begins to run on the date of the last affirmative act of tax evasion."); *United States v. Ferris*, 807 F.2d 269, 271 (1st Cir. 1986) (holding that, in tax evasion prosecution based on defendant's alleged willful failure to pay taxes due, "it is the date of the latest act of evasion, not the due date of the taxes, that triggers the statute of limitations"); *United States v. Dandy*, 998 F.2d 1344, 1355 (6th Cir.1993) (holding that, for charges based on the filing of allegedly false income tax returns, the defendant's conduct a year after filing—filing corporate returns that disguised income from the relevant years and refusing to comply with IRS subpoena for information regarding income for relevant years—constituted "the last affirmative evasive acts" of the charged evasion because "the IRS would very likely have discovered defendant's income tax fraud" had it not been for the later evasive acts); *United States v. Orrock*, 23 F.4th 1203, 1207 (9th Cir. 2022) (". . . under § 7201, the government may prosecute a defendant for any acts furthering the evasion of taxes, even after all the elements of a § 7201 offense have first been met.").

But the parties have not addressed these issues, and the Court need not reach them to resolve the matter at hand. For present purposes, the Court concludes that, while an assessment-evasion offense based upon the filing of an allegedly false return will typically be complete upon the filing of said return, there may be certain circumstances where a post-filing act of evasion constitutes a part of such an offense.[16]

This case does not present one of those circumstances. As the Court explained above, the allegations regarding O'Donoghue's alleged February 2023 false statements are an outlier among the rest of the affirmative acts of evasion alleged in the Indictment. Every other affirmative act of evasion charged in the Indictment is alleged to have occurred within the four-year span of 2012 to 2016, while the charged false statements allegedly occurred more than six years later. Furthermore, the object of the charged assessment-evasion—the underassessment of O'Donoghue's income tax liability for 2012 through 2015—had been achieved prior to the February 2023 interview, meaning there was no assessment for O'Donoghue to evade or defeat at the time he allegedly made the false statements. And even if there were some hypothetical way for a 2023 interview to impact the IRS's completed assessment of a tax for the years 2012 through 2015, the context of the Government's February 2023 interview with O'Donoghue shows that it was related to criminal prosecution rather than tax assessment. Accordingly, on the Court's reading of the Indictment, O'Donoghue's alleged false statements were not affirmative acts in furtherance of the charged assessment-evasion for tax years 2012 through 2015.

---

[16] For instance, there may be a circumstance where an individual files an allegedly false return with the IRS and then makes false statements to civil IRS adjustment personnel working on the assessment of the individual's allegedly false return. Or an individual may file an allegedly false return and then file an allegedly false amendment to that return before the IRS finalizes its assessment on the original return. In these circumstances, it may be reasonable to argue that the post-filing conduct (i.e., either the false statements to adjustment personnel or the false amended return) is a continuation of earlier alleged false filing.

The Government has not identified any caselaw to warrant a different reading of the Indictment. In its Opposition, the Government cites *United States v. Thompson*, 518 F.3d 832 (10th Cir. 2008), and *United States v. Shorter*, 608 F.Supp. 871, 874 (D.D.C. 1985), *aff'd*, 809 F.2d 54 (D.C. Cir. 1987), for the proposition that "it is not uniformly true that the crime of tax evasion must be complete when a false return is filed." Gov't's Opp'n at 5. As explained above, the Court has accepted this general legal proposition for present purposes. These cases, however, do not show why it should apply to the facts here.

In *United States v. Thompson*, the defendants were charged with evading the assessment of personal income tax for the tax years 1992 through 1997 by filing individual income tax returns that failed to report certain commissions as income. 518 F.3d at 838. In 1998, the defendants filed "several sets of amended corporate returns, in which they attempted to claim that the commissions were actually corporate income, rather than personal income." *Id*. at 846, 852. This claim was false. In determining when the statute of limitations began to run for the assessment-evasion charges regarding defendants' personal income, the Tenth Circuit concluded that the limitations period began in 1998 because the false amended corporate returns could reasonably be viewed as an affirmative act of evasion with respect to the charged personal income assessment-evasion. *Id*. at 856–57. In other words, the Tenth Circuit held that filing a false corporate return to hide income that was not reported on a previously filed personal return can constitute an affirmative act of assessment-evasion with respect to the previously filed personal return.[17]

---

[17] A similar holding can be found in *United States v. Orrock*, 23 F.4th 1203 (9th Cir. 2022), which the Government cites to in a footnote in its Sur-Reply for the proposition that it can prosecute O'Donoghue for any acts furthering the evasion of taxes, even if those acts allegedly occurred after all the necessary elements of the assessment-evasion had been met. *See* Gov't's Sur-Reply at 3 n.1 (citing *id*. at 1207 ("under § 7201, the government may prosecute a defendant for any acts furthering the evasion of taxes, even after all the elements of a § 7201 offense have first been met.") [sic]). In *Orrock*, the defendant was charged with assessment-evasion for the year 2007 because his personal return for that year allegedly failed to report income from the sale of a property. *Id*. at 1205–06. In 2011, the defendant filed a partnership tax return that underreported the gain from the sale of the property, thereby disguising income that should have been included in the 2007 assessment. *Id*. The Ninth Circuit appeared to assume the district court's conclusion

To the extent its reasoning applies in the venue context,[18] *Thompson* reinforces the principle that, in assessment-evasion cases premised on the filing of allegedly false returns, post-filing conduct must bear some logical relationship to the underlying assessment-evasion if it is to be considered an affirmative act of evasion. The ways in which the post-filing conduct in *Thompson* had such a relationship highlight the ways in which O'Donoghue's post-filing statements do not. First, the post-filing corporate returns in *Thompson* were filed shortly after the false personal returns that gave rise to the underlying assessment-evasion, whereas O'Donoghue's alleged post-filing false statements were allegedly made more than six years after the remaining acts of assessment-evasion. *Thompson*, 518 F.3d at 852–57. More important than this temporal difference, however, is the contrast between the *effect* of the post-filing conduct in *Thompson* and O'Donoghue's alleged post-filing statements. The post-filing corporate returns in *Thompson* were filed directly with the IRS, which was responsible for completing the assessment at the heart of the underlying assessment-evasion, and they directly impacted the IRS's ability to assess the defendants' income tax liability because they fraudulently disguised the defendants' personal income as corporate income. *Thompson*, 518 F.3d at 852–57. Here, on the other hand, O'Donoghue's alleged false statements were made to prosecutors and law enforcement agents responsible for bringing criminal charges, not assessing tax liability, and the alleged statements could not have impacted the IRS's assessment of O'Donoghue's relevant income tax liability because the IRS had completed that assessment at some point before O'Donoghue allegedly made the false statements in question. Accordingly, the facts of *Thompson* are readily distinguishable

---

that the government had sufficiently alleged that the 2011 partnership filing constituted an affirmative act of evasion with respect to the 2007 assessment-evasion. *Id*. at 1208. The Ninth Circuit instead focused on the legal question of whether the statute of limitations for assessment-evasion offenses based on the filing of allegedly fraudulent returns begins to run on the date of filing or the date of the last known act of evasion, holding that it begins to run on the date of the last known act of evasion. *Id*. at 1205–1209.

[18] Elsewhere, the Government argues that the Court should not apply reasoning from statute-of-limitations cases because the statute of limitations "has a different set of rules" from venue. Gov't's Sur-Reply at 3.

and do not undermine the Court's finding that O'Donoghue's alleged February 2023 false statements are not a part of the charged assessment-evasion.

The Government does not explain its citation to *United States v. Shorter*, but a review of the case shows that it bears little relevance to the issues at hand.  To start, *Shorter* was a payment-evasion case; the defendant "was charged with one felony count of willful attempt to evade the payment of income taxes due for the years 1972 through 1983."  809 F.2d 54, 56; *id*. at 57 (explaining that the IRS "obtained at least nine civil tax judgments against appellant, but because of the cash method of operation, the IRS was never able to collect on any of these judgments").  Furthermore, the issue in *Shorter* was whether an indictment charging a multi-year payment-evasion scheme as one count was duplicitous.  *Id*. at 56–57.  The D.C. Circuit concluded that such an indictment was permissible, explaining that "tax evasion covering several years may be charged in a single count as a course of conduct in circumstances such as those here where the underlying basis of the indictment is an allegedly consistent, long-term pattern of conduct directed at the evasion of taxes for these years."  *Id*. at 56.  That is not the situation at hand.  Accordingly, other than the fact of the Government's citation, it is not clear how *Shorter* is relevant.

The Court also granted the Government the opportunity to file a Sur-Reply.  *See* Order, Dkt. No. 109.  But the few additional cases cited by the Government in its Sur-Reply do little to support its argument.  The Government cites *United States v. Beacon Brass Co.*, 344 U.S. 43 (1952), and *United States v. Hesser*, 800 F.3d 1310 (11th Cir. 2015), for the general legal proposition that "[m]aking false statements to IRS agents is a classic act of evasion."  Gov't's Sur-Reply at 2.  Again, the validity of the Government's general legal proposition is not in dispute; rather, as the Court has explained, the issue with characterizing O'Donoghue's alleged false statements as a part of the charged assessment-evasion is that O'Donoghue's alleged false

39

statements are not sufficiently connected to the underlying assessment-evasion charges. Neither of these cases suggest otherwise.

In *Beacon Brass*, the Supreme Court held that false statements could form the basis of both a tax evasion charge and a false statements charge. 344 U.S. at 45–46. In doing so, the Court explained that the language of Section 7201[19] was "broad enough to include false statements made to Treasury representatives for the purpose of concealing unreported income," emphasizing that "[t]he purpose to evade taxes is crucial under this section." *Id*. But the Court did not elaborate on the requisite connection between alleged false statements and the underlying tax evasion charge, nor did it express an opinion on whether the false statements charged in the underlying case were sufficiently connected to the charged tax evasion. *Id*. at 47 ("We do not consider these questions because our jurisdiction on this appeal is limited to review of the District Court's construction of the statute . . . ."). Accordingly, *Beacon Brass* simply establishes the general legal proposition that the Court has already accepted.

*Hesser*, on the other hand, was a payment-evasion case that involved a single count of tax evasion relating to a variety of actions the defendant took to avoid paying income taxes he owed for 2001 through 2003. 800 F.3d 1310, 1314. The Eleventh Circuit affirmed the district court's finding that the defendant's filing of an allegedly fraudulent 2007 tax return was an affirmative act taken in furtherance of the charged 2001–2003 payment-evasion. *Id*. at 1324. The court reached this conclusion because the allegedly fraudulent 2007 return had the direct effect of eliminating the outstanding tax liability that formed the basis of the underlying payment-evasion charge. At the time the defendant filed the allegedly fraudulent 2007 return, the IRS had opened an enforcement action against defendant for his unpaid tax deficiencies for 2001 through 2003 and

---

[19] The case specifically dealt with a predecessor statute that employed the same language.

filed federal tax liens against the defendant. *Id*. at 1317–18. By allegedly overstating his entitlement to a refund on his 2007 return, the defendant caused the IRS to process the refund, pay off his tax liabilities for 2001 through 2003 with funds from the refund, release the federal tax liens, close its enforcement case, and send defendant the residual amount of the remaining refund once his liabilities were settled. *Id*. Put simply, *Hesser* stands for the proposition that in a payment-evasion case for certain tax years, a fraudulent tax return filed in subsequent years can constitute an affirmative act of payment-evasion if that subsequent filing misleads the IRS into determining that the outstanding liability at the core of the payment-evasion charge has been settled. That proposition does not have much bearing on the present case.

All in all, the Government has not shown that the "likely effect" of O'Donoghue's alleged February 2023 false statements was to mislead the IRS in its assessment of his 2012–2015 income tax or to conceal income from the IRS relevant to its assessment for those years. An alleged act of evasion must have some logical connection to the underlying tax evasion charges. That connection is not present here. The February 2023 interview occurred more than six years after the rest of the acts constituting the charged assessment-evasion. By this time, there was no 2012–2015 assessment left for O'Donoghue to evade because the IRS had already completed its assessment and processed O'Donoghue's refunds. This fact supports the conclusion that the February 2023 interview, which was conducted by prosecutors and federal investigators rather than by civil tax adjustment personnel, was in service of a criminal investigation rather than a tax assessment.

By characterizing O'Donoghue's alleged February 2023 false statements as part of the charged 2012–2015 assessment-evasion, the Government overlooks the distinction between conduct meant to conceal the commission of a completed crime and conduct meant to further the

41

commission of a crime still in progress.  As the Supreme Court explained in *Grunewald v. United States*, 353 U.S. 391 (1957), "a vital distinction must be made between acts of concealment done in furtherance of the main criminal objectives," and "acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime."  *Id*. at 405.

In *Grunewald*, the Supreme Court held that acts of concealment done after the central criminal objective of a conspiracy has been achieved cannot, without more, extend the life of the conspiracy.  353 U.S. at 406.  The *Grunewald* defendants were charged and convicted of conspiring to defraud the United States in its administration of the internal revenue laws by bribing a tax official to obtain "no prosecution" rulings[20] on two tax evasion cases that were then under investigation.  *Id*. at 394–99.  On appeal, the defendants argued that their prosecution was barred by the applicable three-year statute of limitations because the indictment against them was returned more than three years after the final "no prosecution" ruling was obtained.  *Id*. at 397–98.  The government argued that the conspiracy continued beyond the final "no prosecution" ruling because the conspirators engaged in ongoing acts of concealment within the limitations period, including efforts to destroy records, mislead investigators, and silence witnesses during congressional and grand jury inquiries.  *Id*. at 395–99.  It also argued, in the alternative, that the purpose of the charged conspiracy was to avoid tax prosecution altogether, so the limitations period did not begin to run until the end of the limitations period for the underlying tax offense.  *Id*.

The Supreme Court rejected the government's arguments.  As to the first, the Court held that the duration of a conspiracy cannot "be indefinitely lengthened merely because the conspiracy is kept a secret, and merely because the conspirators take steps to bury their traces, in order to avoid detection and punishment after the central criminal purpose has been accomplished."

---

[20] The Court defined a "no prosecution" ruling as "an internal decision by the investigative branch of the Bureau of Internal Revenue not to press criminal charges against a taxpayer."  *Grunewald*, 353 U.S. at 395 n. 5.

*Grunewald*, 353 U.S. at 405.  That is because "acts of covering up can by themselves indicate nothing more than that the conspirators do not wish to be apprehended—a concomitant, certainly, of every crime since Cain attempted to conceal the murder of Abel from the Lord." *Id*. at 405–06. Accordingly, if the objective of the defendants' conspiracy was to obtain the "no prosecution" rulings, then acts taken to conceal the conspiracy after the final "no prosecution" ruling was obtained were not, without more, acts taken in furtherance of the conspiracy.  *Id*.  As to the government's alternative argument that the objective of the conspiracy was to evade tax prosecution altogether, the Court explained that it could not accept this argument because the district court's charge to the jury "failed completely to distinguish between concealment in order to achieve the central purpose of the conspiracy (that is, the immunization of the taxpayers from tax-evasion prosecution), and concealment intended solely to cover up an already executed crime (that is, the obtaining of the 'no prosecution' rulings)." *Id*. at 413–14.  If the government wanted to pursue this argument on remand, then the jury had to be instructed that "acts of concealment could be taken as furthering the conspiracy only if the basic criminal aim of the conspiracy was not yet attained," for such acts "are meaningful only if they are within the scope of the conspiratorial agreement." *Id*. at 414.

*Grunewald* is instructive to the issue at hand.  For one thing, *Grunewald* suggests that O'Donoghue's charged evasion was complete once his allegedly false returns were filed with the IRS in 2016.  *See Grunewald*, 353 U.S. at 407 n. 19 (explaining that the statute of limitations on the underlying tax evasion cases "began to run when the last return . . . was filed by the taxpayers"). But more importantly, *Grunewald* directs this Court to observe the "vital distinction" that "must be made" between "acts of concealment done in furtherance of the main criminal objectives" of a charged offense, and "acts of concealment done after these central objectives have been attained,

for the purpose only of covering up after the crime." *Id*. at 405.  The alleged objective of O'Donoghue's charged tax evasion was to evade the IRS's assessment of his income tax for tax years 2012 through 2015.  On the facts here, this alleged objective would have been achieved before the February 2023 interview when the IRS assessed O'Donoghue's 2012–2015 income tax liability and issued his purported refund for those years.  The Court need not determine whether some hypothetical act following the IRS's assessment could have extended the offense because, on the present record, O'Donoghue's alleged February 2023 false statements appear to be, at the very most, alleged "acts of concealment done after [this] central objective[] [had] been attained, for the purpose only of covering up after the crime."  *Grunewald*, 353 U.S. at 405.

Accordingly, pursuant to the Supreme Court's direction in *Grunewald*, the Court is mindful of maintaining the "vital distinction" between acts done to further the "central criminal purpose" of a charged offense and acts done "to avoid detection and punishment after the central criminal purpose has been accomplished."  353 U.S. at 405.  Because O'Donoghue's alleged February 2023 false statements more readily fall into the latter category, the Court reads *Grunewald* to counsel against the Government's attempt to establish venue for the tax evasion charges in the District of Columbia based on these alleged false statements.

\* \* \*

In sum, the Court concludes that O'Donoghue's alleged February 2023 false statements do not establish venue in the District of Columbia under the general venue statute because they were not affirmative acts of evasion in furtherance of his charged attempt to evade or defeat the IRS's assessment of his income tax liability for tax years 2012 through 2015.  The allegations regarding O'Donoghue's alleged false statements at the February 2023 interview with prosecutors and law enforcement do not connect O'Donoghue's alleged false statements to the IRS's assessment of

44

O'Donoghue's income tax liability for 2012–2015. Rather, the only potential connection between O'Donoghue's alleged false statements and the underlying tax evasion charges is that O'Donoghue's alleged false statements could be viewed as conduct intended to interfere with the Government's prosecution of his already-completed alleged tax evasion, which is a connection that does not warrant a finding that the alleged false statements were a continuation of the underlying tax evasion charges. *See Grunewald v. United States*, 353 U.S. 391 (1957).

Accordingly, the Court shall **GRANT** O'Donoghue's [79] Motion to Dismiss for Lack of Venue with respect to the tax evasion charges in Counts One through Four of the Indictment.

### IV. CONCLUSION

The Court concludes that venue is not proper in the District of Columbia for the tax evasion and false-subscription charges contained in Counts One through Eight of the Indictment. Venue for these charges cannot be established in the District of Columbia under the "high seas" venue statute, 18 U.S.C. § 3238, because an essential conduct element of the charges (i.e., the filing of O'Donoghue's allegedly false 2012–2015 income tax returns) allegedly occurred domestically in the Western District of Texas. And venue for these charges cannot be established in the District of Columbia under the general venue statute, 18 U.S.C. § 3237(a), because none of the charges involve relevant conduct that occurred in the District of Columbia.

Accordingly, for the foregoing reasons, it is hereby **ORDERED** that Defendant Graham O'Donoghue's [79] Motion to Dismiss Count 1–8 of the Indictment for Lack of Venue is **GRANTED**. An Order shall accompany this Memorandum Opinion.

**SO ORDERED.**

**Dated:** July 22, 2026

COLLEEN KOLLAR-KOTELLY
United States District Judge

45